NICOLA T. HANNA
United States Attorney
PATRICK R. FITZGERALD
Assistant United States Attorney
Chief, National Security Division
PAUL C. LeBLANC (Cal. Bar No. 319862)
Assistant United States Attorney
Terrorism and Export Crimes Section
    8000 United States Courthouse
    411 West Fourth Street
    Santa Ana, California 92701
    Telephone: (714) 338-3537
    Facsimile: (714) 338-3708
    E-mail:    paul.leblanc@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>             Plaintiff,<br><br>             v.<br><br>TIAN MIN WU,<br>    aka "Bob Wu,"<br>    aka "David Wu,"<br>    aka "Graham Sones,"<br>    aka "Edward Wang,"<br><br>             Defendant. | Case No. CR 17-00081-PSG<br><br>GOVERNMENT OPPOSITION TO MOTION TO DISMISS INDICTMENT<br><br>Hearing Date: August 5, 2019<br>Hearing Time: 10 AM<br>Location:      6A<br>Est. Time:     1 Hour |

Plaintiff United States of America, by and through its counsel of record, the United States Attorney for the Central District of California and Assistant United States Attorney Paul C. LeBlanc, hereby files its Government Opposition to Motion to Dismiss Indictment.

1        This Opposition is based upon the attached memorandum of points

2   and authorities, the files and records in this case, and such further

3   evidence and argument as the Court may permit.

4   Dated: July 10 2019                 Respectfully submitted,

5                                       NICOLA T. HANA
                                        United States Attorney
6
                                        PATRICK R. FITZGERALD
7                                       Assistant United States Attorney
                                        Chief, National Security Division
8

9                                          /s/
                                        _____
10                                      PAUL C. LeBLANC
                                        Assistant United States Attorney
11
                                        Attorneys for Plaintiff
                                        UNITED STATES OF AMERICA

2

**TABLE OF CONTENTS**

DESCRIPTION                                                                PAGE

MEMORANDUM OF POINTS AND AUTHORITIES.................................1

I.    INTRODUCTION.................................................1

II.   STATEMENT OF FACTS..........................................1

III.  ARGUMENT....................................................6

      A.    Jurisdiction is Proper................................6

            1.    Krypto 500 Software.............................7

            2.    Viasat Satellite Modem.........................9

      B.    The Regulatory Scheme is not Vague....................12

      C.    Counts One Through Four State an Offense..............20

IV.   CONCLUSION..................................................21

i

1

**TABLE OF AUTHORITIES**

2

DESCRIPTION                                                           PAGE

3

**Federal Cases**

4

Russell v. United States,
5       369 U.S. 749, 768 n.15 (1962) .............................. 12

6    Screws v. United States,
        325 U.S. 91 (1945) ......................................... 15

7

8    United States v. al Kassar,
        660 F.3d 108 (2d Cir. 2011) ................................ 12

9    United States v. Al-Talib,
        55 F.3d 923 (4th Cir. 1995) ................................. 7

10

11   United States v. Archer,
        486 F. 2d 670 (2d Cir. 1973) ................................ 6

12   United States v. Bagnario,
        665 F.2d 877, 900 n. (9th Cir. 1981) ..................... 6, 7

13

14   United States v. Bohonus,
        628 F.2d 1167 (9th Cir. 1980) .............................. 12

15   United States v. Buckley,
        689 F.2d 893 (9th Cir. 1982) ............................... 13

16

17   United States v. Chi Mak,
        683 F.3d 1126 (9th Cir. 2012) .............................. 14

18   United States v. Guo,
        634 F.3d 1119 (9th Cir. 2011) .............................. 17

19

20   United States v. Hoffman, Nos. 92-50299, 93-50116
        1993 U.S. App. LEXIS 30604 (9th Cir. Nov. 12, 1993) ........ 15

21   United States v. Jackson,
        72 F.3d 1370 (9th Cir. 1995) ............................... 15

22

23   United States v. Jiminez,
        191 F. Supp. 3d 1038 (N.D. Cal 2016) ....................... 18

24   United States v. Kuok,
        671 F.3d 931 (9th Cir. 2012) ........................... passim

25

26   United States v. Mousavi,
        604 F.3d 1084 (9th Cir. 2010) .............................. 18

27

28

ii

**TABLE OF AUTHORITIES (CONTINUED)**

DESCRIPTION                                                    PAGE

United States v. Ochoa,
    861 F.3d 1010 (9th Cir. 2017) ............................... 14

United States v. Rodriguez-Rodriguez,
    453 F.3d 458 (7th Cir. 2006) ................................. 7

United States v. Roth,
    628 F.3d 827 (6th Cir. 2011) ................................ 16

**STATUTES:**

22 U.S.C. § 2278 ........................................ 15, 19

22 U.S.C. § 2778 ......................................... passim

50 U.S.C. §§ 1705 ............................................ 17

**MISCELLANEOUS:**

Black's Law Dictionary 314 (5th ed. 1979) ................... 14, 17

**REGULATIONS:**

15 C.F.R § 736.2 ........................................ 16, 17

15 C.F.R. § 764.2 .................................... 16, 17, 21

22 C.F.R §§ 121.1, 123.1, 127.1 ......................... 14, 21


**RULES:**

Fed. R. Crim. Proc. 12 ....................................... 6

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.   INTRODUCTION

Defendant Tian Min Wu ("defendant") is charged with violating the Armed Export Control Act ("AECA") and the International Emergency Economic Powers Act ("IEEPA"), smuggling, and money laundering. (Indict., Dkt. 5.)  From June 2013 until his arrest by Greek law enforcement officials in 2017, defendant attempted to purchase export-controlled items from undercover agents from U.S. Homeland Security Investigations ("HSI").  During the course of conduct charged in the indictment, defendant negotiated with undercover agents to purchase two export-controlled items:  Krypto 500 (decryption software which is on the United States Munitions List ("USML")) and a Viasat modem (a satellite encryption modem which is on the Commerce Control List ("CCL")).

### II.   STATEMENT OF FACTS

In June 2013, TECOM, Inc., ("TECOM")-a U.S. [telecommunications] company-received an unsolicited inquiry for a High Gain Antenna[1] through the company's website from bob2099@sina.com, later identified by subscriber information to be operated by the defendant, (the "defendant's email address").  In the inquiry, defendant stated "We are from China – mainland, one trading company, and we are interested in your antenna – T-4000 High Gain Antenna, Could we get the quotation for this?  Could we to b your partner at China – Main land? BR Bob."  TECOM found the inquiry suspicious and forwarded it to HSI.

On June 10, 2013, an HSI agent, acting in an undercover capacity ("UCA1"), sent an email to defendant.  UCA1 explained that he was an

---

[1] This antenna is used for military aircraft communications and is ITAR controlled.

independent broker.  UCA1 told defendant that if he was interested in purchasing the High Gain Antenna, that he could provide defendant a quote.

At various times in June 2013, defendant and UCA1 communicated by email.  Defendant asked for sales quotes on various export-controlled items, including modems, aviation helmets, sonar sensors as well as other controlled items.  Defendant identified himself as a broker and stated that his customer was located in mainland China.  During these negotiations, UCA1 indicated that because of the risk of selling the requested items, UCA1 includes a 25% risk fee to cover costs.  UCA1 also informed defendant that the items he was trying to purchase were subject to export restrictions to China because the items were controlled by the International Traffic Arms Regulations ("ITAR").

On July 2, 2013, UCA1 received an email from defendant stating that defendant wanted to meet UCA1 in a third country to effectuate payment for the items.  On January 20, 2014, UCA1 received an email from defendant confirming his desire to purchase Krypto 500,[2] the agreed-upon price, and terms of payment, and defendant provided his Skype contact information.

For the next several months, UCA1 and defendant exchanged emails that discussed terms of payment and delivery of the Krypto 500 to a Beijing, China address.  In February 2014, defendant notified UCA1 that he would pay $15,200 via Paypal.  UCA1 received two payments, one for $10,000 and one for $5,200 to his PayPal account.  The funds were transferred from a Paypal account registered to the name, "WU Tian Zhong."

---

[2] Krypto 500 is a United States Munitions List item that encrypts and decrypts military communications.

2

On April 3, 2014, UCA1 sent an email to defendant that stated that the "shipment" had been seized by U.S. Customs and Border Protection ("CBP") and that CBP was requesting a copy of the export license for the Krypto.[3]  Defendant and UCA1 agreed to meet in Thailand to discuss further transactions.  UCA1 emailed that she would not be able to make the meeting, but would send her associate, also an HSI agent acting in an undercover capacity ("UCA2").

On May 1, 2014, defendant arrived at the Bangkok International Airport on a China Eastern flight originating in the People's Republic of China ("PRC").  After departing the plane, defendant applied for admission into Thailand.  Defendant presented his PRC passport, bearing the name "Tianmin WU" to Thai Immigration officials.

On May 2, 2014, UCA2 met with defendant at the hotel in Bangkok, Thailand.  The conversation between defendant and UCA2 was surreptitiously audio and video recorded.  During the meeting, UCA2 advised defendant that the Krypto is controlled for export from the U.S.  UCA2 explained to defendant that he would be charging defendant a risk fee of 25% for exporting the Krypto to defendant in the PRC and stated the fee was part of doing business.  UCA2 and defendant then negotiated and agreed on the $11,500 price for a second Krypto. Defendant said he would only pay upon delivery of the software. Defendant also gave UCA2 a handwritten list of five different products and companies and asked UCA2 to look into procuring the items for him.

---

[3] The item was never shipped by the undercover agents, the "seizure" was a ruse by the agents.

3

1    In December 2014, UCA1 received an email from defendant

2 requesting information regarding a Comtech satellite modem made by a

3 U.S. manufacturer.  UCA1 informed defendant that the modem was a

4 military item and required a license to export.  Defendant and UCA

5 exchanged emails discussing the number of modems defendant wanted and

6 payment options.  On March 25, 2015, UCA1 provided defendant an

7 invoice for three Comtech satellite modems for a total price of

8 $314,115.

9    On March 14, 2016, defendant sent UCA1 a link to a ViaSat

10 satellite modem.  UCA1 provided defendant an invoice for the ViaSat

11 satellite modem.  Defendant and UCA1 exchanged a number of emails

12 discussing the ViaSat satellite modem configuration.

13    On April 27, 2016, the parties communicated via Skype audio.

14 The call was an audio conversation only, not a two-way video

15 conversation, and was recorded.  In it, UCA1 and defendant agreed to

16 meet in Thailand to discuss the purchase of the items.

17    Defendant arrived in Thailand on June 9, 2016, under the name,

18 "Tianmin Wu."  UCA1 and defendant met at a hotel the next day.  The

19 meeting was recorded.  UCA1 stated that the items defendant was

20 asking for were sensitive and that the U.S. government monitored the

21 export of sensitive items.  Defendant stated he understood ITAR and

22 that some of the items he sought to purchase were controlled by the

23 U.S. government as military items.

24    Defendant, UCA1, and UCA2 met again on June 10, 2016.  That

25 meeting was also recorded.  The parties discussed payment

26 arrangements, with the following payment structure:  one-third down

27 payment prior to shipment, one-third of the payment after defendant

28 inspects the product, and the final third when the product is

4

1   received.   On October 23, 2016, UCA1 sent defendant a ViaSat

2   Satellite Modem invoice.   On November 1, 2016, defendant stated his

3   customer would pay 30% in advance and 70% on delivery.   UCA1 provided

4   banking information and identified her company as International

5   Logistics Incorporated with a Post Office Box in Los Angeles,

6   California.   Defendant wired $11,980 to UCA1's account on November

7   14, 2016.

8        From November 2016 through February 2017, UCA1 and defendant

9   exchanged text messages on Viber[4] to set up the meeting.   The parties

10  discussed meeting in Greece in late November 2016, in which defendant

11  would have the opportunity to inspect the ViaSat satellite modem.

12  On February 8, 2017, defendant met UCA1 and UCA2 in Athens, Greece at

13  a restaurant.   The meeting was audio and video recorded.   UCA1 told

14  defendant that while the export of the Krypto out of the United

15  States was unlawful under ITAR, the ViaSat satellite modem could

16  legally be exported from the United States to China, but that if the

17  Chinese government was the intended recipient of the modem, the

18  export would be unlawful.

19       On February 9, 2017, defendant again met UCA1 and UCA2.   The

20  meeting was audio and video recorded.   During this meeting, UCA1

21  provided nonfunctioning ViaSat satellite modems for defendant to

22  inspect.   After defendant inspected the modems, he stated that the

23  inspection was good and that he would provide an address to UCA1 the

24  following week for shipment of the modems to Beijing, China.   After

25  the parties departed the meeting, defendant was arrested by Greek

26  authorities upon request of the United States Government.

27  _____

28       [4] Viber is a peer-to-peer, encrypted communications application
    utilized on a smartphone.

**III. ARGUMENT**

In general, a party may raise by pretrial motion a defense, objection, or request that the court can determine without a trial on the merits.  Fed. R. Crim. Proc. 12(b)(1).

**A.   Jurisdiction is Proper**

Defendant argues that the government manufactured jurisdiction in this case by "lur[ing] [defendant] to transfer funds via wire to the United States under the pretext that material that required a license be exported would be sent to him."  (Motion at 11.)  "In doing so, it was the federal officers that manufactured the facts to create a federal crime where none existed" (Id.).

Defendant relies upon United States v. Archer, 486 F. 2d 670 (2d Cir. 1973) for the proposition that the government may not manufacture jurisdiction in order to charge defendants with crimes. Here the defense merges an entrapment defense with a claim of governmental action manufacturing jurisdiction.  Regardless of the lens which this defense is viewed through, it fails.  Indeed, the Ninth Circuit specifically limited the argument endorsed by Archer:

> Archer has been characterized as a case involving "virtual entrapment," United States v. Hall, 536 F.2d 313, 327 (10th Cir.), cert. denied, 429 U.S. 919, 97 S. Ct. 313, 50 L. Ed. 2d 285 (1976), and has been severely restricted.  The Second Circuit itself referred to Archer as addressing a "federally provoked incident of local corruption." United States v. Gambino, 566 F.2d 414, 419 (2d Cir. 1977), cert. denied, 435 U.S. 952, 98 S. Ct. 1580, 55 L. Ed. 2d 802 (1978).

United States v. Bagnario, 665 F.2d 877, 900 n. 15 (9th Cir. 1981).

In Archer, federal agents created a scheme designed to cause defendants to use interstate facilities to effectuate their criminal conduct.  Id. at 898.   In order to provide an interstate nexus, the

6

agents staged a fictitious arrest, falsified arrest records, and crossed state lines expressly for the purpose of causing defendants to use interstate facilities.  Without agent-directed use of interstate facilities, federal authorities would not have had jurisdiction to prosecute defendant's criminal conduct in New York.

Moreover, the Ninth Circuit recently addressed manufactured jurisdiction and held:

> There is no such thing as 'manufactured venue' or 'venue entrapment.'" United States v. Al-Talib, 55 F.3d 923, 929 (4th Cir. 1995); see also United States v. Rodriguez-Rodriguez, 453 F.3d 458, 462 (7th Cir. 2006) (holding that the entrapment doctrine does not apply to venue, and that the proper remedy for prosecutorial forum shopping is Federal Rule of Criminal Procedure 21(b)).
>
> Although we have not yet adopted a similar holding rejecting manufactured venue in this circuit, we need not decide the issue today.  We have noted that Archer "cannot offer . . . generally applicable principles" and that it has been limited to cases involving "extreme" law enforcement tactics.  United States v. Bagnariol, 665 F.2d 877, 898 n.15 (9th Cir. 1981).

United States v. Kuok, 671 F.3d 931, 938 (9th Cir. 2012).

Here, the record clearly establishes that defendant initiated the purchase of export-controlled items, that he could only obtain such items by transporting them across international borders, and that his conduct necessarily relied upon international financial systems to purchase and transport items from one country into another.

    1.  Krypto 500 Software

On May 30, 2013, defendant sent an unsolicited email to TECOM, a manufacturer of export controlled military items[5] (Exhibit A).

---

[5] TECOM Industries is located in Thousand Oaks, CA.

Defendant specifically requested to purchase a T-4000 High Gain Antenna.  TECOM forwarded this request to HSI.

On June 10, 2013, an HSI agent, acting as a UCA, emailed defendant and introduced herself as an "independent broker" and "often assists customers seeking aviation and military parts" (Exhibit B).  On June 13, 2013, defendant responded requesting information on the antenna and indicated he received "no response from [TECOM]" (Id.).

Defendant made it abundantly clear from his unsolicited email to TECOM that he wanted to procure export controlled items.  Defendant expressed no reticence in dealing with the UCAs.   Indeed, defendant even hinted at his frustration that TECOM ignored his request

In contrast to Archer, here defendant directed the purchase of export-controlled items into China in violation of U.S. law.  Defendant first solicited an export-controlled item from TECOM before HSI agents became involved in the investigation.  Defendant then sought specific export-controlled items from law enforcement agents, disregarding the agents' repeated admonitions that such items were unlawful to import into China.  Thus, the unlawful transportation of export-controlled items across international borders was central to defendant's criminal aims.

Moreover, contrary to defendant's allegations that the undercover agents lured him into transferring funds internationally to manufacture jurisdiction, defendant directed the negotiations and was the first to inquiry about payment methods, asking UCA1? "what's your payment condition? And lead time?"  (Exhibit C).  The agents merely responded to defendant's inquires and told defendant "I can accept payment in multiple ways" (Id.).  The agents reiterated that

8

1  the price included a "risk fee" because the items were unlawful to

2  sell without an export license.  (Exhibit C) "[a]nd it will be

3  impossible for met (sic) to get a license.  This is to protect me

4  from getting into any trouble with the US authorities and this is why

5  I charge a risk fee of 25% above the sell price" (Exhibit C).

6      The agents informed defendant, "I can accept payment in multiple

7  ways" (Id.).  The email exchanges indicate a wire transfer of money

8  is acceptable to the UCAs but not to defendant, who asks "are there

9  other payment choice to protect us?"  (Exhibit D).  Defendant asks

10  about the use of an L/C (letter of credit) which the UCAs do not

11  agree to (Exhibit D).  Finally, defendant and UCAs negotiated a price

12  and defendant chose to pay via PayPal (Exhibit E).

13      The record shows that defendant initiated the unlawful purchase

14  of export-controlled items and then directed the negotiations with

15  the undercover agents.  Defendant's only means of obtaining the items

16  he sought was to import export-controlled items across international

17  borders and use international financial systems to transfer money.

18  The government did not manufacture jurisdiction; defendant's criminal

19  scheme depended on systems affecting interstate and international

20  commerce to effectuate his unlawful activities.

21          2.   Viasat Satellite Modem

22      During the course of conduct resulting in this indictment,

23  defendant and UCAs discussed several other items defendant wanted to

24  purchase.  Defendant asked about various modems.  On December 3,

25  2014, the UCAs provided defendant information regarding export

26  controls on modems.  The UCAs indicated the modem that defendant

27  wanted to purchase was a military design and required a license from

28  the Department of Commerce ("DOC").  The UCAs also provided defendant

with various models that were "No License Required" ("NLR") (Exhibit F).  Defendant responded on December 18, 2014 "we are not interested in NLR peoducts [sic] that can be purchased in China" (Exhibit G).

On March 14, 2016, defendant identified a specific modem and sent the UCAs a link to a Viasat modem (Exhibit H).  On April 1, 2016, the UCAs provided defendant with an invoice for the Viasat modem (Exhibit I).  On July 24, 2016, the UCAs send defendant an email "[j]ust checking in to see if you're still interested in our deal.  Let me know so I can plan accordingly" (Exhibit J).  Defendant responded, "it is not just interested in, it is real.  Please give me some time" (Id.).  On November 1, 2016, defendant offered terms on the modem and on November 2, 2016, the UCAs agreed and provided wire transfer information (Exhibit K).  On November 14, 2016, defendant wired $11,980 to the UCAs undercover Bank of America account (Exhibit L).

Through the entire course of the conduct underlying the indictment it is clear that the UCAs were not extreme in their conduct.  Moreover, defendant makes no such argument while positing that the government manufactured jurisdiction in this case.  Indeed, because the facts do not support such a claim defendant is unable to argue any misconduct on the part of the UCAs.

Defendant and the UCAs continued a dialogue via email and discussed various issues associated with defendant's request for export controlled items.  Because there is no evidence that the defendant expressed any reluctance to participate in purchasing export controlled items without a required license or even any indication of outrageous conduct on the government's part, the defendant's claim of manufactured jurisdiction should be rejected.

Finally, defendant argues that the government manufactured jurisdiction by requiring defendant to wire transfer money into the U.S. as a way to avoid a licensing requirement claiming that defendant was not required to obtain a license.  Defendant argues that as the end-user of the products he solicited, he was not required to have a license issued by the United States.

As to the Krypto 500 software, there is a blanket prohibition from the Department of State on exporting this item to China.  It cannot be exported for an individual or for the government of the PRC (Exhibit M).  This was made clear to defendant by the UCAs (Exhibit C).

As to the ViaSat modem, this item is controlled by the DOC based upon its encryption capabilities.  This modem can be exported to non-governmental end-users in the PRC (Exhibit N).  However, during undercover meetings with defendant in Thailand and Greece, defendant told the UCAs that the modem would be used for "Government communications," and "anti-terrorism Department" or "Secretary" (Exhibit O Bates 5270, lines 6-25, Bates 5271, lines 1-17; Bates 5012, lines 12-25, Bates 5013, lines 1-17).

Defendant wanted to purchase U.S. controlled items.  He, without any prompting or even knowledge by law enforcement, reached out to a U.S. manufacturer and inquired about controlled items.  UCAs developed a relationship with defendant, discussed items, negotiated process and terms and met with defendant three times outside of China.  Defendant does not and cannot make one allegation of extreme conduct.  Nor has defendant pointed to one instance where the UCAs forced defendant to do anything contrary to his will.

As the Second Circuit has explained, "[g]enerally, to be 'outrageous,' the government's involvement in a crime must involve either coercion or a violation of the defendant's person." United States v. al Kassar, 660 F.3d 108, 121 (2d Cir. 2011), cert. denied, 132 S.Ct. 2374 (2012).

Accordingly, the government did not manufacture jurisdiction and the indictment should not be dismissed.

**B.    The Regulatory Scheme is not Vague**

Defendant claims that counts one and two are vague are meritless.

An indictment must provide a description of the charges sufficient to (1) enable the defendant to prepare his defense; (2) ensure that he is being prosecuted on the basis of facts presented to the grand jury; (3) enable him to plead double jeopardy against a later prosecution; and (4) inform the court of the facts alleged so that it can determine the sufficiency of the charge. Russell v. United States, 369 U.S. 749, 763, 768 n.15, 771 (1962); United States v. Bohonus, 628 F.2d 1167, 1173 (9th Cir. 1980) (reversing the district court's dismissal of an indictment for mail fraud).

The statute alleged in count one of the indictment states:

> (2)   Except as otherwise specifically provided in regulations issued under subsection (a)(1), no defense articles or defense services designated by the President under subsection (a)(1) may be exported or imported without a license for such export or import, issued in accordance with this chapter and regulations issued under this chapter, except that no license shall be required for exports or imports made by or for an agency of the United States Government (A) for official use by a department or agency of the United States Government, or (B) for carrying out any foreign assistance or sales program authorized by law and subject to the control of the President by other means.
>
>     (c)   Criminal violations; punishment

12

> Any person who willfully violates any provision of this
> section, section 2779 of this title, a treaty referred to
> in subsection (j)(1)(C)(i), or any rule or regulation
> issued under this section or section 2779 of this title,
> including any rule or regulation issued to implement or
> enforce a treaty referred to in subsection (j)(1)(C)(i) or
> an implementing arrangement pursuant to such treaty, or who
> willfully, in a registration or license application or
> required report, makes any untrue statement of a material
> fact or omits to state a material fact required to be
> stated therein or necessary to make the statements therein
> not misleading, shall upon conviction be fined for each
> violation not more than $1,000,000 or imprisoned not more
> than 20 years, or both.

22 U.S.C. § 2778.

The USML provides wide categories of articles and technology that are export-controlled by the U.S. government.  As stated in the indictment, defendant attempted to export, cause others to export, and counseled, demanded, and induced the export from the United States of a Decoder, a defense article as defined by Category XI of the USML, without having first obtained a license or authorization from DDTC to do so. (Indictment, Dkt. 5.)

Defendant appears to argue that since the *specific* decoder that defendant attempted to procure is not *specifically* listed in Category XI of the USML, he was not properly on notice of the crime he was committing.  "[T]he issue . . . is whether the indictment adequately alleges the elements of the offense and fairly informs the defendant of the charge, not whether the Government can prove its case." United States v. Buckley, 689 F.2d 893, 897 (9th Cir. 1982).

Here, the indictment adequately alleges the elements of the offense.  Count one alleges defendant attempted to export a defense article.  The elements of that offense are:

> First:  the defendant intended export a defense article
> without obtaining the required license from the State
> Department;

Second:  the defendant did something that was a substantial step toward committing the crime and that strongly corroborated the defendant's intent to commit the crime; and

Third:  the defendant acted willfully.

Ninth Circuit Model Criminal Jury Instructions, No. 5.3 [Attempt]; 22 U.S.C. § 2778(b)(2), (c); 22 C.F.R §§ 121.1, 123.1, 127.1(a), (e); United States v. Ochoa, 861 F.3d 1010, 1017 (9th Cir. 2017); United States v. Chi Mak, 683 F.3d 1126, 1131 (9th Cir. 2012).

Count one of the indictment also alleges defendant knowingly and willfully solicited the export of, caused others to export, and counseled, demanded, and induced the export a defense article.  The elements are:

First:  The defendant solicited, caused, counseled, demanded, or induced another to export from the United States without the required license issued by the Department of State, a defense article; and

Second:  The defendant acted willfully.

See 22 U.S.C. § 2778(b)(2), (c); 22 C.F.R §§ 121.1, 123.1, 127.1(a), (e).  The term "counsel" means "[a]dvice and assistance given by one person to another in regard to a legal matter, proposed line of conduct, claim, or contention.  The words 'counsel' and 'advise' may be, and frequently are, used in criminal law to describe the offense of a person who, not actually doing the felonious act, by his will contributed to it or procured it to be done."  Black's Law Dictionary 314 (5th ed. 1979).  The term "demand" means "[t]o claim as one's due; to require; to ask relief."  Id. at 386.  The term "induce" means "[t]o bring on or about, to affect, to cause, to influence to an act or course of conduct, lead by persuasion or reasoning, incite by motives, prevail on."  Id. at 697.

14

First, in both counts one and two of the indictment, the government must prove defendant acted willfully.  "Courts have often rejected arguments that a law is vague when it requires specific intent because, necessarily, to support a conviction the defendant must have intended to violate the law.  See, e.g., Screws v. United States, 325 U.S. 91 (1945).  The AECA requires specific intent for a conviction, and, as the district court found, evidence that Hoffman knowingly intended to export restricted data was virtually dispositive." United States v. Hoffman, Nos. 92-50299, 92-50354, 93-50116, 1993 U.S. App. LEXIS 30604, at *5 (9th Cir. Nov. 12, 1993).

During the course of negotiating the Krypto 500 purchase, the UCAs, in no uncertain terms, informed defendant of the illegality of his purchase (Exhibit C).  Similar to the facts in Thomas, it is clear that defendant "intended to export restricted items.  Thus, the laws here are not so vague as to violate due process."  Id.

Moreover, the indictment tracks the language of the statutes. "An indictment that tracks the words of the statute violated is generally sufficient, but implied, necessary elements, not present in the statutory language, must be included in an indictment." United States v. Jackson, 72 F.3d 1370, 1380 (9th Cir. 1995).

Finally, the government need not prove that defendant knew that the Krypto 500 was on the USML nor the category in which it resides. While not specifically addressed by this Circuit, the government need only prove that defendant knew he was violating the law. "[F]ollowing Bryan and the swath of cases from other circuits interpreting section 2778(c), we hold that section 2778(c) does not require a defendant to know that the items being exported are on the Munitions List.  Rather, it only requires knowledge that the

underlying action is unlawful." <u>United States v. Roth</u>, 628 F.3d 827, 835 (6th Cir. 2011). <u>Accord</u> <u>Mousavi</u>, <u>infra</u>.

Count two of the indictment charges defendant knowingly and willfully solicited the export of, attempted to export, caused others to export, and counseled, demanded, and induced the export from the United States to the PRC, intending to deliver it to the government of the PRC, of the Modem, a commercial good controlled by the CCL under ECCN 5A002.A1, without first having obtained a license or authorization from the Department of Commerce to do so.

The statute alleged in count two of the indictment states:

(1)General Prohibition One - Export and reexport of controlled items to listed countries (Exports and Reexports).  You may not, without a license or License Exception, export any item subject to the EAR to another country or reexport any item of U.S.-origin if each of the following is true:

    (i) The item is controlled for a reason indicated in the applicable Export Control Classification Number (ECCN). . .

15 C.F.R § 736.2

VIOLATIONS

(a)Engaging in prohibited conduct. No person may engage in any conduct prohibited by or contrary to, or refrain from engaging in any conduct required by, the EAA, the EAR, or any order, license or authorization issued thereunder.

(b)Causing, aiding, or abetting a violation. No person may cause or aid, abet, counsel, command, induce, procure, or permit the doing of any act prohibited, or the omission of any act required, by the EAA, the EAR, or any order, license or authorization issued thereunder.

(c)Solicitation and attempt. No person may solicit or attempt a violation of the EAA, the EAR, or any order, license or authorization issued thereunder.

15 C.F.R. § 764.2

The elements of the offense in count two are:

16

> First:  The defendant solicited, caused, counseled, demanded, or induced the export of a good from the United States to the People Republic of China without obtaining the required license issued by the Department of Commerce; and

> Second:  The defendant acted willfully.

See 50 U.S.C. §§ 1705(a), (c); 15 C.F.R. §§ 736.2, 764.2, and Parts 738 and 774.  The term "counsel" means "[a]dvice and assistance given by one person to another in regard to a legal matter, proposed line of conduct, claim, or contention.  The words 'counsel' and 'advise' may be, and frequently are, used in criminal law to describe the offense of a person who, not actually doing the felonious act, by his will contributed to it or procured it to be done."  Black's Law Dictionary 314 (5th ed. 1979).  The term "demand" means "[t]o claim as one's due; to require; to ask relief."  Id. at 386.  The term "induce" means "[t]o bring on or about, to affect, to cause, to influence to an act or course of conduct, lead by persuasion or reasoning, incite by motives, prevail on."  Id. at 697.

As to the attempt allegation in count two of the indictment, the elements are:

> First:  the defendant intended to unlawfully export from the United States to the People's Republic of China a good without obtaining the required license issued by the Department of Commerce;

> Second:  the defendant did something that was a substantial step toward committing the crime and that strongly corroborated the defendant's intent to commit the crime; and

> Third:  the defendant acted willfully.

See 9th Cir. Model Instr. 5.3; 50 U.S.C. §§ 1705(a), (c); 15 C.F.R. §§ 736.2, 764.2, and Parts 738 and 774; United States v. Guo, 634 F.3d 1119 (9th Cir. 2011).

ECCN 5A0020.01 is the control number of the modem that defendant requested to purchase, paid for and took delivery of in Greece on February 9, 2017. "ECCN 5A0020.01 controls 'components' providing the means or functions necessary for "information security."" Pt. 774, Supp. No. 1. Paragraph a.1 further defines the controlled items as "[d]esigned or modified to use "cryptography" employing digital techniques performing any cryptographic function…." These terms are not so unusual that a "person of ordinary intelligence" would not have known that the modem in question fell within this definition.

The government is not required to prove that defendant knew that the specific modem he sought to export was on the CCL or even captured by ECCN 5A0020.01. The government need only prove that defendant knew he was violating the laws of the United States. United States v. Mousavi, 604 F.3d 1084, 1093 (9th Cir. 2010) ("[w]e conclude that "willfulness" under IEEPA requires the government to prove beyond a reasonable doubt that the defendant acted with knowledge "that his conduct was unlawful," Bryan, 524 U.S. at 186, but not that the defendant was aware of a specific licensing requirement."

Defendant relies on United States v. Jiminez, 191 F. Supp. 3d 1038 (N.D. Cal 2016) for the proposition that he was unaware that the items he attempted to export would violate U.S. law. In Jiminez, defendant challenged his conviction for purchasing a "lower receiver" portion of a machine gun. The Court found that defendant did not have notice that a lower receiver violated U.S. law. The government "concede[d] that the plain language of the law does not answer the vagueness challenge." Id. at 1041.

18

That is not the case here, however.  The government makes no such concession.  The plain language of the law and the implementing regulations are clear.  Title 22 U.S.C. § 2278 makes clear that no defense articles or defense services designated by the president under subsection (a)(1) may be exported or imported without a license.  The USML has broad categories and is not able to capture every piece of military equipment developed and manufactured.  Category XI(b) identifies not specific items but capabilities in general.  Defendant is properly on notice under Category XI with the plain language.

The same holds true for the modem under the CCL.  The language is clear as stated above, "you may not export items that are classified under the CCL without a license."  5A002 informs defendant that cryptographic equipment is covered.  The CCL, like the USML, is not designed to list out each specific item developed and manufactured.  It categorizes the technology broadly but succinctly and defendant cannot claim otherwise.

In Jimenez the government attempted a "last gambit" to prove defendant knew he was violating the law by the conversations between defendant and the undercover agents.  The Court was unpersuaded as the discussions were vague and did not "clearly apprise" defendant of the illegality of his conduct.  That is the opposite of the UCAs in this case.  UCAs directly informed defendant that the Krypto 500 was ITAR controlled, it required a license from the Department of State, which they would not be able to get, which the UCAs would get in trouble if they applied for a license and that the UCAs were charging defendant 25% above the normal price as a risk fee (Exhibit C).  The government believes the language of the statute and implementing

regulations is clear and direct and gives defendant ample notice that his conduct was criminal.  However, the interactions of the UCAs and defendant make it obvious that he was well informed about his criminality.

The UCAs told defendant that the modem he wanted to purchase was military equipment and required a license or an exemption.  The UCAs asked defendant if he wanted a regular commercial modem without the license requirement and defendant made it clear he wanted the military grade modem (Exhibits F, G).

Finally, defendant whistles past the fact that he himself send the UCAs a link to the Viasat modem (Exhibit H).  Defendant requested to purchase https://www.viasat.com/products/satcom-md-1366-ebem. This website, still active as of the time of this filing, includes the data sheet for the modem defendant wanted to purchase.  A person of "ordinary intelligence" would see the advanced capabilities of this modem and be on notice that it was a military modem.  The term "encryption" is used nine times in the two page data sheet (Exhibit O).  Again, this is the information *defendant* provided to the UCAs. Defendant cannot scour the Internet looking for highly technical military products, request to purchase them and then hide behind professed ignorance of that very technical data.  Recall that defendant himself initiated this case by claiming to be from a "trading company" and sought to buy a USML antenna (Exhibit A)

### C.   Counts One Through Four State an Offense

Defendant argues that that he merely "engaged in activities designed to cause an undercover agent to export the defense articles" (Motion at 19).  And that since no item was exported, defendant was "attempting to cause and export."  Defendant relies on <u>United States</u>

1  v. Chi Tong Kuok, 671 F.3d 931 (9th Cir. 2012).  In Kuok, defendant

2  was charged in a very similar scheme to export controlled items from

3  the U.S.  As applicable at the time of Kuok, "Section 127.1(a)(1)

4  makes it unlawful "[t]o export or attempt to export from the United

5  States . . . by a U.S. person of any defense article . . . or by

6  anyone of any U.S. origin defense article . . . for which a license

7  or written approval is required . . .  without first obtaining the

8  required license."  22 C.F.R. § 127.1(a)(1).  Id. at 940.  "We hold

9  that attempting to cause an export of defense articles without a

10  license is not a violation of U.S. law, and vacate Kuok's conviction

11  on count three."  Id. at 942.

12      Kuok was decided January 17, 2017.  On February 11, 2014, 22

13  C.F.R. § 127.1 was changed and included the following language:  (e)

14  No person may knowingly or willfully attempt, solicit, cause, or aid,

15  abet, counsel, demand, induce, procure, or permit the commission of

16  any act prohibited by, or the omission of any act required by 22

17  U.S.C. 2778, 22 U.S.C. 2779, or any regulation, license, approval, or

18  order issued thereunder (Exhibit P).  Title 15 C.F.R. § 764.2 has

19  similar language that criminalizes solicitation and attempt, as well

20  as causing, aiding, or abetting a violation under the Export

21  Administration Regulation.  Thus defendant's argument is without

22  merit and should be denied.

23  **IV.  CONCLUSION**

24      The government respectfully requests that this Court deny

25  defendant's motion to dismiss and asks the Court to set a hearing

26  date that allows the parties to prepare for trial.

27

28